**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-00260-TJK** |
| **JACQUELYN STARER,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jacquelyn Starer to 27 months' incarceration, the mid-point of the Guidelines range calculated by the government, three years of supervised release, restitution in the amount of $2,000, and special assessment fees totaling $305.

### I.     INTRODUCTION

The defendant, Jacquelyn Starer, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Starer, a physician, entered the Capitol through the Rotunda Doors approximately fifteen minutes after they had been breached. She proceeded with rioters to the Rotunda and joined a crowd of shouting rioters attempting to move past police guarding a passageway to Speaker Pelosi's office. Starer shoved rioters to get to the front of the crowd and pushed away a rioter attempting to hold her back. She then struck Officer M.B. with her closed fist. Starer retreated but then returned to the line and moved her hands toward Officer M.B. while yelling "Fucking bitch!" Her assault riled up the hostile crowd and contributed to the dangerousness of the situation. Starer posted a video and message on Parler forewarning future violence, commenting that rioters were being dispersed "For now." She has yet to show remorse for her actions.

The government recommends that the Court sentence Starer to 27 months' incarceration, the middle of the advisory Guidelines' range of 27-33 months as calculated by the government for her convictions of violating 18 U.S.C. § 231(a)(3) (Count One); 18 U.S.C. § 111(a) (Count Two); 18 U.S.C. § 1752(a)(1) (Count Three); 18 U.S.C. § 1752(a)(2) (Count Four); 18 U.S.C. § 1752(a)(4) (Count Five); 40 U.S.C. § 5104(e)(2)(D) (Count Six); 40 U.S.C. § 5104(e)(2)(G) (Count Seven); and 40 U.S.C. § 5104(e)(2)(F) (Count Eight). A sentence of 27 months' incarceration reflects the gravity of Starer's conduct, but also acknowledges her admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case,

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

ECF 35, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

###### B.      Starer's Role in the January 6, 2021 Attack on the Capitol

In the days leading up to January 6, Starer traveled from Massachusetts to Washington, D.C. Hotel records indicate she first traveled to West Springfield, Massachusetts on January 4 and departed on January 5. A message posted to her Parler account on or about January 5, 2021, inquired: "Does anyone have updates on the caravan leaving from Springfield MA?" Phone and hotel records show that Starer arrived in Washington, D.C. on January 5.

According to an anonymous tip later submitted to the FBI, prior to January 6, Starer bragged to a mutual acquaintance that she "was prepared" for it, with a mesh knife-proof shirt and bottles of pepper spray.

Starer attended the Trump speech at the Ellipse in the morning of January 6, 2021, and then she made her way to the U.S. Capitol. As shown below in Image 1, Starer was dressed in red colored clothing, including a red hat with blue and white stripes with the word TRUMP and number 45 written on it, a red jacket, red scarf, and a backpack. She also wore a dark colored skirt and boots.



*Image 1: Starer, circled in yellow, dressed in red near the Ellipse in front of the National Museum of African American History.*

### Starer's Approach to the Capitol and Breach of the Building

Starer joined a group of rioters on the East Front of the Capitol. Numerous rioters initially breached the Rotunda Doors by opening the doors from inside the Capitol building at approximately 2:26 p.m. Police officers resecured the doors, but other rioters breached the doors again at approximately 2:36 p.m.

As shown in Image 2 below and Exhibit A from time marks 5:01 to 5:30, Starer stood in the crowd in front of the Rotunda Doors after the second breach.



*Image 2: Still from Exhibit A at 5:03 showing Starer, outlined in yellow, in front of the Rotunda Doors before entering the Capitol.*

As the building alarm blared, a rioter in front of Starer shouted through a bullhorn that people inside the building would be arrested and suggested rioters "step outside."

Nevertheless, Starer forced her way inside the building. At approximately 2:51 p.m., approximately fifteen minutes after the Rotunda Doors had been breached, Starer walked through the doors. Image 3 below is an image from surveillance video of the door, and Starer is circled in red.



*Image 3: Starer, circled in red, immediately after entering through the Rotunda doors at 2:51 p.m.*

Starer then walked into the Rotunda, which has been described as "the very heart of the Capitol." *U.S. Capitol Building*, United States Senate, https://www.senate.gov/about/historic-buildings-spaces/capitol/overview.htm (last accessed Aug. 19, 2024). Amidst rioters smoking marijuana, Starer took a selfie, as shown in Exhibit B at 0:40 to 0:57.

### *Starer's Assault of MPD Officer M.B.*

At approximately 2:58 p.m., a group of MPD and United States Capitol Police officers were standing at the top of the stairs off of the west side of the Capitol Rotunda. The police were guarding the west entrance to the Rotunda leading to Speaker Pelosi's office suite, as shown below in Image 4.

6



*Image 4: Police line indicated with red arrow on west side of the Rotunda and Speaker Pelosi's office indicated in red on west side of the building.*

Rioters yelled, threatened, assaulted and interfered with officers on the line protecting the area as the situation escalated. *See* Exhibit C at 0:01 to 1:45 (open-source video of crowd); Exhibit D at 3:45 to 5:00 (body worn camera video captures officer telling the crowd to back up); *see also United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 7-8 (describing how another rioter's "vicious shouts poured gasoline into this combustible environment"). Officers directed the rioters by pushing their batons forward and directing the rioters to back up.

At approximately 2:59 p.m., Starer shoved her fellow rioters so she could advance through the mob at the west entrance of the Rotunda and to the front of the police line. *See* Exhibit E at 00:56 to 1:33. Image 5 below is a photograph of Starer, circled in yellow, at the front of the crowd.



*Image 5: Starer, circled in yellow, after she pushed through the crowd and at the line of officers guarding the west entrance.*

She yelled at and confronted the officers, pointing behind them in the direction of Speaker Pelosi's office. Image 6 below is a still photo from body worn camera footage in Exhibit D at 5:00 to 5:15 showing Starer approach the police line.



*Image 6: Starer pointing behind officer line in the direction of Speaker Pelosi's office suite.*

Starer pushed up against another rioter who attempted to hold Starer back. Starer grabbed and pushed the rioter's arm down. She then pushed against the line of officers, including against the side of MPD Officer M.B. M.B. was dressed in an MPD uniform with a bike helmet, reflective jacket, vest, and badge.

MPD Officer M.B. pushed Starer backward, and Starer spun around and struck MPD Officer M.B. with her closed fist. Images 7, 8, and 9 below, which are still images from Exhibit D at 5:23 to 5:30, documenting the assault. *See also* Exhibit F at 2:20 to 2:42 (M.B. body worn camera footage of the assault).

9



*Image 7: Starer lifts fist before striking Officer M.B.*



*Image 8: Starer using physical force against Officer M.B.*



*Image 9: Starer after hitting Officer M.B.*

Starer moved away from the officers and then stepped towards them again, moving her hands toward Officer M.B. As heard in Exhibit F at 2:33 to 2:35, Starer yelled, "Fucking bitch!"

The crowd responded to the assault and became even more confrontational with the officers. One of the rioters told officers to "take care of that Officer," presumably M.B., because "she is going to cause a big fucking problem." Exhibit D at 5:35 to 5:54.

The crowd became more agitated, and rioters pushed back against the police line. Officers attempted to hold the line and restrict the rioters from passing through the archway entrance to the area behind them. However, because of the push from the rioters, including Starer, the officers were backed up against the Western Rotunda staircase that led down to the Upper West Terrace Doors. *See* Exhibit E at 3:07 to 3:45. Another rioter grabbed Officer M.B.'s baton, causing her to lose her balance and fall down the stairs. Starer was affected by the chemical irritant that was deployed during the altercation.

***Starer Exits the U.S. Capitol Building***

After that altercation, Starer exited out of the U.S. Capitol Building through the East Rotunda

Doors, as shown in Image 10 below.



*Image 10: Starer, circled in red, with jacket unzipped and blue vest visible*

Starer exited the building at approximately 3:06 p.m., approximately 15 minutes after she entered.

She then walked down the East Front steps, as shown in Image 11. She appears to be wearing a dark

colored jacket, blue vest and red colored waist pack.



*Image 11: Starer leaving the Capitol steps.*

Open-source video and images suggests Starer was affected by a chemical irritant deployed when she was in the Capitol. She received aid from other rioters, including a rioter clad in camouflage wearing a helmet with a military-style patch with the word "MILITIA," as shown below in Image 12.



*Image 12: Starer receiving first aid assistance to her face.*

*Post Riot Statements*

On or about January 7, as shown in Image 13 below, Starer posted to her Parler account a video from the West Plaza in front of the inaugural stage scaffolding. The video showed rioters exiting the area and a female voice, presumably Starer, stated "Well, they've just teargassed everybody in front of the . . . after they killed a girl inside apparently. Now the cops are teargassing Americans. These people are going to be back tonight, I'm pretty sure." Exhibit G.



*Image 13: Parler posting with video and message "As the crowd finally gets dispersed by tear gas. For now"*

## III.    THE CHARGES AND PLEA

On August 2, 2023, a federal grand jury returned an indictment charging Starer with eight counts, including: (1) Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); (2) Assaulting,

14

Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); (3) Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); (4) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); (5) Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4); (6) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); (7) Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); and (8) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). On April 30, 2024, Starer plead guilty to all counts without a plea agreement.

## IV.     STATUTORY PENALTIES

Starer now faces sentencing on the above eight counts in the Indictment. Page two of the Presentence Report issued by the U.S. Probation Office identified the maximum sentences for each of the counts of conviction.   Counts One and Two are felonies carrying a special assessment fee of $100 (totaling $200). For the Class A misdemeanors (Count Three, Four and Five), there is a special assessment of $25 (totaling $75). Finally, for the Class B misdemeanors (Counts Six, Seven and Eight), there is a special assessment of $10 (totaling $30). Altogether, those special assessment fees total $305.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.   *Id.*     The

United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.*

**Guidelines Analysis**

  A.  **Analysis for each count**

**Count One: 18 U.S.C. § 231(a)(3)—Obstructing or Impeding Officers During a Civil Disorder**

  Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline." U.S.S.G. § 2X5.1. Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If the offense involved physical contact … increase by 3 levels."<br><br>Starer made physical contact with MPD Officer M.B. when Starer struck Officer M.B. with her closed fist. |
| Cross reference | See below | U.S.S.G. § 2A2.4(c): "If the conduct constituted aggravated assault, apply U.S.S.G. § 2A2.2(a) (Aggravated Assault)."<br><br>The Application Notes to Section 2A2.2 define "aggravated assault" as a "felonious assault that involved … (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; … or (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt n. 1.<br><br>The conduct of Starer constituted aggravated assault because it was a felonious assault that involved the intent to commit another felony (Civil Disorder). U.S.S.G. § 2A2.2, cmt. n.1. Therefore, the cross-reference to U.S.S.G. §2A2.2 applies.<br><br>The Guidelines do not define "assault" or "felonious assault." Sentencing courts have looked to the common law to define |

| | | |
|---|---|---|
| | | "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (citations omitted); *Lucas v. United States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (defendant assaulted a police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer, or shoving him"), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979). |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Chapter 3 Adjustment: Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>Alternatively, this adjustment applies under U.S.S.G. § 3A1.2(c)(1): "in a manner creating a substantial risk of serious bodily injury, the defendant, knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense."<br><br>Officer M.B. was a member of the Metropolitan Police Department and was in full uniform that day. |
| Total | 20 | |

**Count Two:   18 U.S.C. § 111(a)—Assaulting, Resisting, or Impeding Certain Officers**

The Statutory Index lists two guidelines for a Section 111 offense, U.S.S.G. § 2A2.2 (Aggravated Assault) and U.S.S.G §2A2.4 (Obstructing or Impeding Officers). The guidelines direct that, if Appendix A lists more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. See §1B1.2 n.1. Here, the most applicable guideline is § 2A2.4 (Obstructing or Impeding Officers).

| Cross reference | See below | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply §2A2.2 (Aggravated Assault)." *See* analysis for Count One, above. |
|---|---|---|
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Chapter 3 Adjustment: Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b), (c)(1): see above |
| Total | 20 | |

**Count Three: 18 U.S.C. § 1752(a)(1)—Entering or Remaining in a Restricted Building or Grounds**

The Statutory Appendix lists two potentially applicable guidelines for a Section 1752 offense, U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct." Here, U.S.S.G. § 2B2.3, which applies to trespass offenses, is the most appropriate guideline for 18 U.S.C. § 1752(a)(1), which is essentially a trespass offense.

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) (trespass) |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted buildings or grounds." On January 6, 2021, the U.S. Capitol and its grounds were restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross-Reference | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that felony offense, if the resulting offense level is greater than that determined above." |

| | | |
|---|---|---|
| | | As described above, Starer entered the restricted area of the Capitol building for the purpose of committing multiple felonies, including civil disorder. |
| Base Offense Level (adjusted) | 14 (from Count One) | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>As described above, Starer entered the restricted area of the Capitol building for the civil disorder, in violation of 18 U.S.C. § 231, thus the substantive offense is Count One and the § 2A2.4 guideline should be used.<br><br>*See* discussion for Count One. |
| Total | 14 | |

**Count Four: 18 U.S.C. § 1752(a)(2)—Disorderly or Disruptive Conduct in a Restricted Building or Grounds**

The Statutory Appendix lists two potentially applicable guidelines provisions for a Section 1752 offense: U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and U.S.S.G. § 2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct." Here, U.S.S.G. § 2A2.4, which applies to impeding officers, is the most appropriate guideline for 18 U.S.C. § 1752(a)(2), which prohibits "disorderly or disruptive conduct" and involves more than mere trespass (making § 2B2.3 an inappropriate guideline for the offense conduct).

| | | |
|---|---|---|
| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) (Obstructing or Impeding Officers) |
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If the offense involved physical contact …   increase by 3 levels."<br><br>*See* discussion for Count One above. |
| Total | 13 | |

**Count Five: 18 U.S.C. § 1752(a)(4)—Engaging in physical violence in a restricted building or grounds**

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass). The Guidelines direct that, if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* §1B1.2 n.1. Here, the most applicable guideline is § 2A2.4.

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) (Obstructing or Impeding Officers) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If the offense involved physical contact … increase by 3 levels." *See* discussion for Count One above. |
| Total | 13 | |

**Counts Six, Seven and Eight: 40 U.S.C. § § 5104(e)(2)(D), (G) and (F)—Disorderly or Disruptive Conduct in a Capitol Building, Parading, Demonstrating, or Picketing in a Capitol Building; and Act of Physical Violence in the Capitol Grounds or Buildings**

Because these offenses are a Class B misdemeanors, the Guidelines do not apply to them. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

**B.    Grouping Analysis**

Under U.S.S.G. §3D1.2, "All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: (a) When counts involve the same victim and the same act or transaction … [or] (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline appliable to another of the counts."

Group One consists of Counts One, Two, and Five charging violations of 18 U.S.C. §§ 231, 111(a) and 1752(a)(4) because the victim of each count is a police officer. The highest offense level for this Group is 20.

Group Two consists of Counts Three and Four, charging violations of 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2), because the victim of each of these counts is Congress. The highest offense level for this Group is 14.

Group One and Group Two group pursuant to U.S.S.G. § 3D1.2(c) because Counts One and Three embody conduct that is treated as a specific offense characteristic. Therefore, all counts group and the combined offense level is 20.

### C.    Acceptance of Responsibility

Starer is entitled to a three-point reduction under U.S.S.G. § 3E1.1(a) and (b) for acceptance of responsibility since she pleaded guilty to the indictment. The draft PSR failed to include that reduction and so reached a total offense level of 20, which is incorrect.

### D.    Criminal History

Based upon the information now available to the government, Starer does not have any prior criminal convictions.

### E.    Guidelines Range

Based upon the total offense level of 17 and the Estimated Criminal History Category I, Starer's estimated Sentencing Guidelines range is 24 to 30 months.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

21

**A.      Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, Starer's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. In the midst of the chaos and mayhem in the Rotunda, Starer shoved rioters to push her way through the crowd to the police line guarding the passageway to Speaker Pelosi's office. Despite her fellow rioters attempts to restrain her, Starer confronted the police line and punched Officer M.B. When prevented from moving forward, she called Officer M.B. a "fucking bitch" and assaulted her again. Rioters reacted to the assault by becoming more aggressive, and they then charged the police line. The nature and circumstances of Starer's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 27 months.

**B.  Starer's History and Characteristics**

Starer is a physician from Ashland, Massachusetts who primarily practiced addiction medicine until her arrest. PSR ¶¶ 92, 96. As set forth in the PSR, prior to her conduct on January 6, 2021, Starer appears to have lived a productive, law-abiding life. While the defendant has some mitigating factors, see PSR ¶ 84-87, none of those should overcome the severity of the crimes in this case. She has no criminal history. PSR ¶¶ 70-74. Starer has been compliant with her conditions of pre-trial release. PSR ¶ 7.

**C.**     **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Starer's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.**     **The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

Starer's actions on January 6 demonstrate the need for specific deterrence for this defendant. She ignored obvious red flags and signs of chaos, forced her way to the front of the crowd, and resisted efforts to calm the situation. Even after she struck Officer M.B. with her closed fist, she returned to the police line and assaulted her again while yelling an expletive and joined the crowd's push against the officers. Starer's lack of care for the safety of the officers and her fellow rioters is even more troubling because her conduct was entirely incongruent with her sworn oath as a physician to do no harm. She could have been expected to render aid, not be the person causing harm.[3] In addition, in a message posted to Parler, she hinted at future violence,

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

[3] Although Starer received aid, the government did not identify any instances in which she provided medical assistance on January 6.

commenting that rioters were dispersed with tear gas "[f]or now." *See also* Exhibit G ("These people are going to be back tonight, I'm pretty sure.")

Starer has yet to express remorse, and the Court should thus view any remorse she expresses at sentencing with skepticism. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Thus, the United States recommends a meaningful sentence of incarceration to convey to Starer that her conduct on January 6 had grave consequences.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have

sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[5] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For example, in *United States v. Kevin Creek*, 21-cr-645-DLF, the defendant similarly made his way to the front of the crowd of rioters as they tried to move forward and through the police line. Creek pleaded guilty to pursuant to a plea agreement to a single charge of assault in violation of 18 U.S.C. § 111(a) and Judge Friedrich sentenced him to 27 months incarceration. While Creek's assaultive conduct caused one officer to be pushed back several feet, another officer

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

to fall backward to the ground, and he threw items at officers, in this case, Starer assaulted the Officer M.B. two times and Officer M.B. fell down the stairs as the result of a subsequent assault by a different rioter. However, Creek and Starer are comparable because they both committed assaults at a time when the officers were particularly vulnerable. In Starer's case, other rioters recognized the officers' position and tried to restrain Starer, but she ignored their warnings.

In *United States v. Quinn Keen*, 23-cr-226-TJK, the defendant, like Starer and Creek, maneuvered to the front of the police line and assaulted officers when they were particularly vulnerable. While on the West Terrace, Keen shoved an officer, and he also threw the contents of a plastic water bottle, the water bottle, and then a metal travel mug at the police line. Keen then went inside the Capitol and was in the Rotunda at the same time as Starer, where he smoked a marijuana joint. Keen pleaded guilty to pursuant to a plea agreement to a single charge of assault in violation of 18 U.S.C. § 111(a) and this Court sentenced him primarily to 24 months incarceration. Keen is distinguishable from Starer because Starer's conduct took place inside the Capitol building while Starer assaulted Officer M.B. inside the building, when the threat of violence against the lawful occupants of the Capitol, such as legislators and their staff members, was at its peak.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291

§ 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Starer was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[6]

Because Starer engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and her criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Starer responsible for her individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Starer to pay $2,000 in restitution for her convictions on Counts One and Two. This amount fairly reflects Starer's role in the offense and the damages resulting from her conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where Starer was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Starer's convictions for violations of $250,000 for Count One, $250,000 for Count Two, $100,000 for Count Three, $100,000 for Count Four, $100,000 for Count Five, $5,000 for Count Six, $5,000 for Count Seven, and $5,000 for Count Eight subject her to a statutory maximum fine of $815,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Starer's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Starer to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Starer has not shown an inability to pay. Indeed, she informed Probation that she has a net worth of over $2.5 million. Under U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $10,000 to $100,000. U.S.S.G. § 5E1.2(c).

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months' incarceration, 3 years of supervised release, restitution in the amount of $2,000, and special assessment fees totaling $305.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   /s/ *Sarah W. Rocha*
SARAH W. ROCHA
Trial Attorney
D.C. Bar No. 977497
601 D Street NW
Washington, DC 20579
Telephone:  202-330-1735
sarah.wilsonrocha@usdoj.gov